Linda Kay Bryant
1411 S. Oxford Avenue
Los Angeles, CA 90006
(323)734-1921

Plaintiff in Pro Per

FILED
CLERK, U.S. DISTRICT COURT

NOV 1 8 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Linda Kay Bryant, an individual

Plaintiff,

vs.

JPMORGAN CHASE BANK, N. A.;
NATIONAL DEFAULT SERVICING
CORPORATION, and DOES 1-10
inclusive,

Defendants.

CV13-08493- SJO(JEMx)

Case No.

**VERIFIED COMPLAINT FOR**:

**1.  WRONGFUL FORECLOSURE**

**2.  QUASI CONTRACT**

**3.  QUIET TITLE**

**4.  DECLARATORY AND
     INJUNCTIVE RELIEF**

**Unlimited Jurisdiction**

**DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, Linda Kay Bryant, an individual ("Plaintiff"),

complaining of the Defendants, and each of them, as follows:

## INTRODUCTION

1.      This is an action brought by Plaintiff for Wrongful Foreclosure; Quiet

Title; Declaratory and Injunctive Relief. Plaintiff, disputes the title and ownership

PAID

NOV 1 8 2013

Clerk, US District Court
COURT 1C12

1

**VERIFIED COMPLAINT**

of the real property in question (the "Oxford Property"), which is the subject of this action. WASHINGTON MUTUAL BANK, FA the originating mortgage lender closed and taken over in receivership by the FDIC, and others alleged to have ownership, have unlawfully sold, assigned and/or transferred their ownership and security interest in a Promissory Note and Deed of Trust related to the Property, and, thus, do not have lawful ownership, a security interest in Plaintiff's Home. Presently, JPMORGAN CHASE BANK, N. A. ("Chase") through its unauthorized foreclosing Trustee, NATIONAL DEFAULT SERVICING CORPORATION ("NDSC") is attempting this wrongful foreclosure on the Home described in detail herein.

2. WaMu, Chase and other banks abandoned traditional underwriting practices and contributed to the boom of real estate speculation by issuing predatory loans, which lowered property values in the United States by 30-60%. Kerry Killinger, CEO of WaMu, took home more than $100 million during the seven years he led WaMu into bankruptcy. In March 2011, the FDIC filed a sixty-page complaint against Killinger and Stephen Rotella, WaMu COO, alleging gross negligence, breach of fiduciary duty, and fraudulent transfers. FDIC v. Kerry Killinger, Stephen Rotella, et. al., Case No. 2:11-cv-00459 (WD WA).

3. WaMu during the period from 2001 through 2008 issued numerous predatory loans to unsuspectiong borrowers like Plaintiff. The loans were

**VERIFIED COMPLAINT**

designed for borrowers to default and lose their property.   WaMu made adjustments to Plaintiff's loan application, so that it would meet underwriting guidelines, resulting in inflated fees to WaMu when the loan was sold to investors, with WaMu acting as servicer.  WaMu would take no risk of  loss when the borrower defaulted.  Borrowers like Plaintiff were set-up to loose their homes. Courts are the only venue to which borrowers can turn to demand discovery from lender to determine who really owns their loan. Many families have lost their homes in the pursuit of justice.

4.      Plaintiff Linda Kay Bryant's home is scheduled to be foreclosed at a **Trustee's Sale on November 18, 2013 at 11:00 AM**.  The alleged debt is unsecured and has been satisfied by default swaps in the securitization process, and discharged on 8/19/2013 in Plaintiff's Federal Bankruptcy ("BK").  Yet Chase and NDSC intend they are foreclosing on a default debt.  They never had claim in Plaintiff's BK, and are strangers to the the Deed of Trust and can prove NO interest.

5.  Plaintiff's loan application was submitted to Washington Mutual, not to Chase, to refinance her mortgage in December 2005.  Plaintiff's Uniform Residential Loan Application[1] was filled in by employees of WaMu to meet underwriting standards so that WaMu would collect fees when it sold the loan to

---

[1] Uniform Loan Appplication, attached and made a part herein as **Exhibit 1**

3

**VERIFIED COMPLAINT**

unsuspecting investors in mortgage-backed securities and collateralized debt obligations.  The application shows only two accounts plaintiff submitted more.

6.    Plaintiff alleges that Defendant Chase cannot show proper receipt, possession, transfer, negotiations, assignment, and ownership of the borrower's original Promissory Note and Deed of Trust, resulting in imperfect security interests and claims.  The power of sale is conferred by the deed of trust, not by statute.  *See Nguyen v. Calhoun, 105 Cal. App. 4th 428, 440 (2003).*

7.    Plaintiff further alleges that Chase cannot establish possession and proper transfer and/or endorsement of the Promissory Note and proper assignment of the Deed of Trust herein; therefore, has not perfected any claim of title or security interest in the Property.  Chase does not have the ability to establish that the mortgages that secure the indebtedness, or Note, were legally or properly acquired.

8.    Plaintiff further alleges that NDSC was not substituted by the lender and is not authorized as the foreclosing trustee by provisions in the Deed of Trust.

9.    Plaintiff alleges that an actual controversy has arisen and now exists between the Plaintiff and Defendants, and each of them.

10.   Plaintiff desires a judicial determination and declaration of her rights with regard to the Property and the corresponding Promissory Note and Deed of Trust.

**VERIFIED COMPLAINT**

11. Plaintiff also seeks redress from Defendants identified herein below for damages, for other injunctive relief, and for cancellation of written instruments based upon:

    a. An invalid and unperfected security interest in Plaintiff's Home hereinafter described;

    b. Void "True Sale(s)" violating New York law and express terms of the

11. Pooling and Servicing Agreement ("PSA")[2] governing the securitization of Plaintiff's mortgage, which is a Trust Agreement required to be filed under penalty of perjury with the United States Securities and Exchange Commission ("SEC") and which, along with another document, the Mortgage Loan Purchase Agreement ("MLPA"), is the operative securitization document created by the finance and securitization industry to memorialize securitization transactions.

    a. An incomplete and ineffectual perfection of a security interest in Plaintiff's Home; *See Glaski v. Bank of Am., N.A., 218 Cal. App. 4th 1079, 160 Cal. Rptr. 3d 449, 460 (2013).*

    b. A void Deed of Trust due to improper securitization, for which there is a reasonable apprehension that, if left outstanding, may cause a serious injury.

---

[2] Pooling and Servicing Agreement,("PSA")attached and made a part herein as **Exhibit 2**
http://www.sec.gov/Archives/edgar/data/1317069/000095011706000299/a41207.txt

**VERIFIED COMPLAINT**

## IDENTITY OF PARTIES AND LAND

12.      Plaintiff Linda Kay Bryant is the owner of a 4-unit residential property located in Los Angeles County, California, known and referred to as 1411 So. Oxford Avenue Los Angeles CA 90006 ("Oxford Property"). She acquired the property by a Grant Deed recorded on March 12, 2002.[3] More particularly, the legal description of this property is:

> THE SOUTHERLY 7 FEET OF LOT 2 AND THE NORTHERLY 41 FEET OF LOT 3 IN BLOCK F OF THE WASHINGTON STREET AND PICO STREET HIGHTS TRACT IN THE CITY OF LOS ANGELES, COUNTYOF LOS ANGELES, STATE OF CALIFORNIA, AS SHOWN ON MAP FILED IN BOOK 25, PAGE 36 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.  Assessor's Parcel No: APN; **5074-003-004**.  Hereafter, this address and legal description as well as all improvements thereon shall be known and referred to as Plaintiff's Property.

13.      Defendant JP MORGAN CHASE BANK, NATIONAL ASSOCIATION, ("Chase") At all times mentioned herein was a New York corporation, with a principal address at 270 Park Avenue New York, NY 10017-2014, claimed note holder, beneficiary and servicer of a Note, alleged, secured by Plaintiff's Oxford Avenue Property.  Registered Agent is C T CORPORATION, whose address is SYSTEM 818 W. Seventh Street, Los Angeles, CA 90017.

14.      Defendant NATIONAL DEFAULT SERVICING CORPORATION ("NDSC") is an Arizona corporation with a principal address at 7720 North 6TH Street, Suite 300 Phoenix, Arizona 85020. Claimed foreclosing Trustee, in the business of conducting foreclosure sale. Registered Agent is C T CORPORATION, whose address is SYSTEM 818 W. Seventh Street, Los Angeles, CA 90017.

---

[3]  Plaintiff's Grant Deed, attached and made a part herein as **Exhibit 3**

**VERIFIED COMPLAINT**

15.   Plaintiff will amend this Complaint should any other parties be found responsible for these acts and will add those parties who are legally responsible for injuries and damages to Plaintiff alleged, or claims some right, title, estate, lien, or interest in the property adverse to Plaintiff's title. Their claims constitute a cloud on Plaintiff's title to the property, or they participated in unlawful or fraudulent acts that resulted in injury to Plaintiff's person or property. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-venturers of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

16.   Upon information and belief, does 1-10 claim to be successors in interest to the Subject Mortgage by virtue of Plaintiff's loan having been securitization with other residential mortgages and promissory notes were securitized by aggregating a large number of promissory notes into a mortgage loan pool, then selling security interests in that pool of mortgages to investors by way of "Secondary Vehicles."

## JURISDICTION

17.   There is diversity of citizenship between Plaintiff and Defendants, Chase and NDSC. The issue in controversy exceeds, exclusive of interest and costs, the sum of $75,000. This court has jurisdiction pursuant to 28 U.S.C. 1332(a). Declaratory relief is authorized under 28 U.S.C. 2210.

**JURY TRIAL DEMANDED**

18.  Plaintiff demands a jury trial on all issues.

**CLAIM FOR RELIEF**

19.  Plaintiff brings this action against Chase and NDSC and Does 1 -10 for attempting to sell Plaintiff's Oxford Avenue Property ("Oxford Property") at a trustee's sale and deprive Plaintiff of her property without a lawful claim. Plaintiff seeks to clear title on her property.

## STATEMENT OF FACTS

20.  Plaintiff is the owner of her Oxford Avenue Property by a Grant Deed executed by Amalia Jones in favor of Linda Kay Bryant on December 10, 2001.

21.  Plaintiff's Residential Loan Application, Adjustable Rate Note[4] and Deed of Trust[5] are dated December 20, 2005.

22.  Plaintiff is named as Borrower on the Note and on the Deed of Trust dated December 20, 2005 ("DOT"). Washington Mutual Bank, FA is identified on the Note and Deed of Trust as "Lender."

23.  On January 30, 2006, WaMu sold and transferred Plaintiff's Note to WaMu Asset Acceptance Corp., the depositor. On the same date, the depositor sold Plaintiff's loan with related loans and assets to the WaMu Mortgage Pass-Through Certificate Series 2006-AR1 Trust and became a part of, or was subject to,

---

[4] Adjustable Rate Note, attached and made a ppart herein as **(Exhibit 4)**
[5] Deed of Trust attached and made a part herein as **(Exhibit 5)**

**VERIFIED COMPLAINT**

a Loan Pool, a Pooling and Servicing Agreement, a Collateralized Debt

Obligation, a Mortgage-Backed Security, a Mortgage Pass-Through Certificate, an

Investment Trust, and/or a Special Purpose Vehicle. Thereafter, WaMu acted solely

as a servicer of the loan, and was neither a Lender not a Beneficiary after January

30, 2006.  The closing date for Series 2006-ARI REMIC Trust was January 30,

2006, which was the cut-off date for adding loans or securities to the pool under

the Pooling and Servicing Agreement and New York trust and securities law.

(taken from Series 2006-ARI Trust,  See Exhibit 2) The Assignment of  DOT is

invalid ( NO Assignment recorded for Chase).

24.    Chase claims to be a note holder, lender, beneficiary, or servicer of the

Subject Mortgage, but Chase did not record a claim of ownership of the

mortgage.    California Reconveyance Company ("CRC") is identified as

Trustee on the DOT. NDSC, Substituted as Trustee by Chase, filed a Notice

of Default against the Property on 6/12/2012.[6]

25.    On or about September 20, 2013, NDSC recorded a Notice of Trustee's

Sale ("NOTS")[7] stating that the Oxford Property would be sold at public auction

on November 18, 2013. The NOTS bears the purported signature of Linda

DeGrandis, Trustee Sales Representative, NDSC. Chase is not named on the

[6] Notice of Default, attached herein and made a part herein as **Exhibit 6**
[7] Notice of Trustee Sale, attached herein and made a part herein as **Exhibit 7**

9

**VERIFIED COMPLAINT**

NOTS.  (Foreclosure In California 2012, reveals the crisis in foreclosure non-compliance by Lenders)[8].

## FIRST CAUSE OF ACTION – WRONGFUL FORECLOSURE

26.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 25.

27.     Days after WaMu originated the loan, WaMu transferred all beneficial interest in the loan to an investment pool: the Series 2006-ARI REMIC Trust.

28.     Neither WaMu, CRC, nor Chase has recorded a transfer of beneficial interest in Plaintiff's note to Chase.

29.     Chase does not have standing to enforce the Note because Chase is not the owner of the Note, Chase is not a holder of the Note, and Chase is not a beneficiary under the Note. Chase does not claim to be a holder of the Note or a beneficiary. Chase is merely named as a contact in the Notice of Default. If Chase could prove that it is a servicer, Chase could not foreclose on Plaintiff's property without authorization from the Lender under Paragraph 22 of the Deed of Trust.

30.     Plaintiff is informed and believes that Chase cannot produce an original Note because Chase does not own the loan and cannot identify the owner of the loan. Chase did not purchase the loan when it took or assumed certain assets of

---

[8]  Foreclosure In California 2012 manuel attached and made a part herein as **Exibit 8**

**VERIFIED COMPLAINT**

WaMu on September 25, 2008 because WaMu had sold its beneficial interest in the loan two years earlier. Plaintiff's loan was not identified as an asset in the Purchase and Assumption Agreement under which Chase purchased certain assets of WaMu.

31.     A power of sale is conferred by the mortgage under Cal. Civ. Code §2924. The Adjustable Rate Note states, "Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder." The Note states in paragraph 7(C): "Notice of Default. If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount." The Note gives the right to collect, if timely payments are not made, to the Lender and anyone who takes the Note by transfer. This does not include a servicer who is not the Note Holder.

32.     According to Plaintiff's Deed of Trust, the "Lender" is WASHINGTON MUTUAL BANK, FA.  Consistent with the language of the Note, only the Lender is authorized under paragraph 22 of the DOT to accelerate the loan:  "Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant of agreement in this Security Instrument… "If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to

be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located." (DOT page 13, paragraph 22).

33.     WASHINGTON MUTUAL BANK, FA remained the Lender for no more than a few days until it sold the loan. Thereafter, it was, at most, a servicer of the loan. The Note Holder or Lender was the Investment Trust or Entity that funded the loan.

34.     Paragraph 24 of the DOT (Plaintiff's Exhibit 4) states:

**¶24 Substitute Trustee**—**"Lender, at its option,** may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without reconveyance of the property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution." Chase seeks to proceed with foreclosure of Plaintiff's property even though it cannot identify the Lender.

35.     No Assignment of the Deed of Trust has been assigned to Chase. No authority is cited for Chase to assign or substitute.

**VERIFIED COMPLAINT**

36.     On June 12, 2012, NDSC recorded a Notice of Default ("NOD"), attached hereto as Exhibit 6, describing the Oxford Property with instructions that Plaintiff contact JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, C/O NDSC in Phoenix, AZ,  to stop the foreclosure. The NOD was signed by Julie A. Butler, "Trustee Sales Supervisor". The NOD references the "Declaration of Compliance (Cal Civil Code Section 2923.5(b )." Declaration is not attached to NOD. In the last paragraph of the NOD Chase is described as "The undersigned mortgagee, beneficiary or authorized agent." Washington Mutual is described in the NOD as the beneficiary. However, Chase's interest in WaMu's assets was acquired on September 25, 2008, and WaMu's beneficial interest had terminated when WaMu sold the Note to investors in 2006.

37.     Chase was not the beneficiary because there was no Assignment from WaMu to Chase, so robosigner, Quentin L. Cottrell, Officer at Chase was not authorized to act on behalf of the beneficiary, to make a Substitution of Trustee[9] as NDSC, and robosigner Julie A. Butler, Trustee Sales Supervisor at NDSC, had NO authorization to sign and record a NOD, and NDSC was not authorized to initiate foreclosure against Plaintiff when it recorded the NOD and NOTS.

---

[9]  Substitution of Trustee, attached herein and made a part herein as **Exhibit 9**

**VERIFIED COMPLAINT**

## SECOND CAUSE OF ACTION – QUASI CONTRACT

38.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 37.

39.     Chase demanded monthly mortgage payments from Plaintiff starting on November 1, 2008, and continued to collect payments from Plaintiff for approximately 26 months. Plaintiff reasonably relied upon Chase's assertion that it was entitled to payments.

40.     Chase knowingly accepted the payments and retained them for its own use knowing that WaMu was not a beneficiary under Plaintiff's Note on the date that its assets were transferred to Chase and therefore Chase did not acquire any right from WaMu to accept or keep Plaintiff's payments.  It would be inequitable for Chase to retain the payments it received from Plaintiff. The equitable remedy of restitution when unjust enrichment has occurred is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.

41.     The DOT stat in Paragraph 23:  "Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee." The obligations to WaMu under the DOT

were fulfilled when WaMu received the balance on the Note as proceeds of sale through securitization to private investors. Chase has been unjustly enriched by demanding and collecting monthly payments from Plaintiff in the amount of $ 63,962.17.

42.   Plaintiff seeks restitution for any payments she made to Chase that were not paid to the lender or beneficiary, if any, and were unjustly retained by Chase. Plaintiff also seeks damages in excess of $200.000 for depreciation to her Oxford Property as a result of the wrongful foreclosure proceedings initiated by Chase.

### THIRD CAUSE OF ACTION - QUIET TITLE

43.   Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 42.

44.   Plaintiff seeks to quiet title against the claims of Defendants and all persons claiming any legal or equitable right, title, estate, lien, or adverse interest in the Oxford Property as of the date the Complaint was filed pursuant to Cal. Code Civil Procedure §760.020.

45.   Plaintiff is the titleholder of the Oxford  Property according to the terms of her Grant Deed (Exhibit 1). WaMu securitized Plaintiff's four-unit residential mortgage loan through WaMu Mortgage Pass-Through Certificates Series 2006-ARI Trust.  Plaintiff is informed and believes that the lawful beneficiary has been paid in full.  The DOT states in paragraph 23: 23.

Reconveyance. Upon payment of all sums secured by this Security Instrument,
lender shall request Trustee to reconvey the Property and shall surrender this
Security Instrument and all notes evidencing debt secured by this Security
Instrument to trustee. Trustee shall reconvey the Property without warranty to
the person or persons legally entitled to it.

46.    The DOT does not state that Plaintiff must pay all sums. It states that all
secured sums must be paid. The obligations owed to WaMu under the DOT were
fulfilled and the loan was fully paid when WaMu received the balance on the
Note as proceeds of sale through securitizatization of the loan and insurance
proceeds from Credit Default Swaps. Chase did not purchase the loan from the
FDIC on 9/25/08.

47.    Defendants' claims are adverse to Plaintiff because defendants are not
Lenders or a holders of the Note, none of the defendants can prove any interest in
the Note or show that the Note is secured by the DOT, as well as for the reasons
set forth in the preceding causes of action. As such, Defendants have no right, title,
lien, or interest in the Oxford Property.

48.    Plaintiff therefore seeks a judicial declaration that the title to the Oxford
Property is vested solely in Plaintiff and that Defendants have no right, title, estate,
lien, or interest in the Property and that Defendants and each of them are forever

enjoined from asserting any right, title, lien or interest in the Property adverse to Plaintiff.

## FOURTH CAUSE OF ACTION –
## DECLARATORY & INJUNCTIVE RELIEF

49.    Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 48.

50.  An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties. Plaintiff contends that: (a) Chase is not the Lender, the present holder in due course, or beneficiary of a Promissory Note executed by Plaintiff.  However, Defendants contend that Chase is the present owner and beneficiary of a Promissory Note executed by Plaintiff; and, (b) Defendants are not real parties in interest, do not have standing, and are not entitled to accelerate the maturity of any secured obligation and sell the Oxford Property because they are not a Lender, beneficiary or authorized agent of a beneficiary under the purported Note. However, Defendants assert that they are entitled to sell the Property.

51.  Plaintiff desires a judicial determination of her rights and duties as to the validity of the Note and DOT, and Defendants' rights to proceed with nonjudicial foreclosure on the Oxford Property. Unless restrained, Defendants will sell Plaintiff's property, or cause it to be sold, to Plaintiff's great and irreparable injury, for which pecuniary compensation would not afford adequate relief.

**VERIFIED COMPLAINT**

52.   Defendants' wrongful conduct, unless and until restrained by order of this court, will cause great irreparable injury to Plaintiff as the value of the property declines under threat of foreclosure and Plaintiff faces the prospect of eviction.

53.  If the foreclosure sale is allowed to proceed, the burden on Plaintiff significantly outweighs the benefit to Defendants, and each of them.  By contrast, if the foreclosure sale is enjoined, the burden to defendants is minimal and is not outweighed by the benefit to Plaintiff.

54.  Plaintiff has no adequate remedy at law for the injuries currently being suffered and that are threatened. It will be impossible for Plaintiff to determine the precise amount of damage that she will suffer if Defendants' conduct is not restrained and Plaintiff must file a multiplicity of suits to obtain compensation for her injuries.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff request judgment as follows:

1.  This court issue a Temporary Restraining Order and Preliminary injunction restraining Defendants and each if them, during the pendency of this case, from continuing with their efforts to conduct a Trustee's Sale of the Home/Oxford Property.

2.  The foreclosure on the Oxford Residence be declared illegal and Defendants be enjoined and restrained from selling the Oxford Residence or attempting to sell it or causing it to be sold, either under power of sale pursuant to the trust deed or by foreclosure action, and from posting, publishing, or

**VERIFIED COMPLAINT**

recording any notice of default or notice of trustee's sale contrary to state or federal law.

3. That the related loan transaction be declared void because of Defendant's and WaMu's misrepresentations, fraud, concealment, and predatory loan practices.

4. That Defendants and each of them make restitution to Plaintiff according to proof for payments made to Chase that were not deposited in the account of the Lender.

5. Actual damages for depreciation to the Property in excess of $200,000.00

6. For judgment determining that Plaintiff is the owner in fee simple of the Oxford Residence contrary to adverse claims of Defendants and that Defendants have no interest in the subject property adverse to Plaintiff.

7. For cost of suit and reasonable attorney fees.

8. For any and all other and further relief that may be just in this matter.


Date: November 15, 2013

Linda Kay Bryant, Plaintiff in Pro Per.

**VERIFIED COMPLAINT**

## **VERIFICATION**

Linda Kay Bryant declares:

     I am plaintiff and HOMEOWNER in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.  I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this __15th__ day of November 2013,  in Los Angeles, California.

    1.  this 15th day of November, 2013

Respectfully submitted,

Linda Kay Bryant, Plaintiff In Pro Per

**VERIFIED COMPLAINT**

## EXHIBITS AND DESCRIPTION

| | | |
|---|---|---|
| 1) | Uniform Residential Loan Application | December 21, 2005 |
| 2) | Pooling and Servicing Agreement | January 6, 2006 |
| 3) | Grant Deed | December  10, 2001 |
| 4) | Adjustable Rate Note | December 20, 2005 |
| 5) | Deed of Trust | December 20, 2005 |
| 6) | Notice of Default | June 12, 2012 |
| 7) | Notice of Trustee Sale | September 20, 2013 |
| 8) | Foreclosure In California | 2012 |
| 9) | Substitution of Trustee | June 12, 2012 |

**VERIFIED COMPLAINT**

# EXHIBIT 1

**VERIFIED COMPLAINT**

DEC 27, 2000 5:06AM

**Pacific Funding Group**

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.
If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below).

| Borrower | Co-Borrower |
|---|---|

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☒ Conventional  ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|
| | ☐ FHA  ☐ USDA/Rural Housing Service | | |

| Amount | Interest Rate | No. of Months | Amortization Type: | ☐ Fixed Rate  ☐ Other (explain): |
|---|---|---|---|---|
| $ 440,000.00 | 5.500 % | 480 | | ☐ GPM  ☒ ARM (type): **FLEX 5 MTA 40 YR** |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP) | No. of Units |
|---|---|
| 1411 S. OXFORD AVENUE, Los Angeles, CA 90006 County: LOS ANGELES | 4 |
| Legal Description of Subject Property (attach description if necessary) | Year Built |
| SEE PRELIM REPORT | 1924 |

| Purpose of Loan: ☐ Purchase  ☐ Construction  ☐ Other (explain): ☒ Refinance  ☐ Construction-Permanent | Property will be: ☒ Primary Residence  ☐ Secondary Residence  ☐ Investment |
|---|---|

| Complete this line if construction or construction-permanent loan. |
|---|

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a+b) $ |
|---|---|---|---|---|---|

| Complete this line if this is a refinance loan. |
|---|

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe improvements ☐ made  ☐ to be made |
|---|---|---|---|---|
| 2002 | $ 248,000.00 | $ 401,086.00 | No Cash-Out Rate/Term | Cost $ |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| LINDA BRYANT | Single woman | ☒ Fee Simple  ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) |
|---|
| EquityOnSubjectProperty |

## III. BORROWER INFORMATION

| Borrower | Co-Borrower |
|---|---|
| **Borrower's Name** (include Jr. or Sr. if applicable) | **Co-Borrower's Name** (include Jr. or Sr. if applicable) |
| LINDA BRYANT | |

| Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (MM/DD/YYYY) | Yrs. School |
|---|---|---|---|---|---|---|---|
| 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 | 323-734-1921 | 02/26/1955 | 17 | | | | |

| ☐ Married  ☒ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower) no. 0  ages | ☐ Married  ☐ Unmarried (include single divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower) no.  ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  ☒ Own  ☐ Rent  No. Yrs. 3Y | Present Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|
| 1411 S. OXFORD AVENUE Los Angeles, CA 90006 | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|
| 1411 S. OXFORD AVENUE Los Angeles,CA 90006 | |

| If residing at present address for less than two years, complete the following: |
|---|

| Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|

## IV. EMPLOYMENT INFORMATION

| Borrower | Co-Borrower |
|---|---|
| Name & Address of Employer  ☐ Self Employed | Yrs. on this job 16YRM | Name & Address of Employer  ☐ Self Employed | Yrs. on this job |
|---|---|---|---|
| US POST OFFICE 505 S. FLOWER Los Angeles, CA 90071 | Yrs. employed in this line of work/profession 17 | | Yrs. employed in this line of work/profession |

| Position/Title/Type of Business | Business Phone (incl. area code) 213-629-5480 | Position/Title/Type of Business | Business Phone (incl. area code) |
|---|---|---|---|

## Pacific Funding Group

### V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 3,950.00 | $ | $ 3,950.00 | Rent | $ | |
| Overtime | | | | First Mortgage (P&I) | 1,551.00 | $ 2,269.39 |
| Bonuses | | | | Other Financing (P&I) | | |
| Commissions | | | | Hazard Insurance | 126.93 | 126.93 |
| Dividends/Interest | | | | Real Estate Taxes | 393.93 | 393.93 |
| Net Rental Income | 2,029.00 | | 2,029.00 | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 5,979.00 | $ | $ 5,979.00 | Total | $ 2,071.86 | $ 2,790.25 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

**Described Other Income Notice:** Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |
| | | |
| | | |

### VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.   Completed ☐ Jointly   ☒ Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | **LIABILITIES** | **Monthly Payment & Months Left to Pay** | **Unpaid Balance** |
| | | Name and address of Company | $ Payment/Months | $ |
| List checking and savings accounts below | | DOWNEY S & L | *(1,551.00) | *(400,111.00) |
| Name and address of Bank, S&L, or Credit Union | | | 480 | |
| | | | | |
| | | Acct. no. 9041719477 | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | CAP ONE BK | 15.00 | 516.00 |
| | | | | |
| | | Acct. no. 4305722362927040 | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | | | |
| | | Acct. no. | | |
| Acct. no. | $ | Name and address of Company | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number & description) | $ | | | |
| | | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | $ |
| Life insurance net cash value | $ | | | |
| Face amount: $ | | | | |
| Subtotal Liquid Assets | $ | | | |

## Pacific Funding Group

### VI. ASSETS AND LIABILITIES (cont.)

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| 1411 S. OXFORD AVENUE Los Angeles, CA 90006 | 2-4 | $ 816,000.00 | $ 400,111.00 | $ 3,400.00 | $ 1,551.00 | $ 520.96 | $ 2,029 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Totals | | $ 816,000.00 | $ 400,111.00 | $ 3,400.00 | $ 1,551.00 | $ 520.96 | $ 2,029 |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

### VII. DETAILS OF TRANSACTION

| | |
|---|---|
| a. Purchase Price | $ |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | 416,158.81 |
| e. Estimated prepaid items | 3,088.00 |
| f. Estimated closing costs | 31,551.45 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 450,798.26 |
| j. Subordinate financing | |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 440,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 440,000.00 |
| p. Cash from / to Borrower (subtract j, k, l & o from i) | 10,798.26 |

### VIII. DECLARATIONS

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower Yes | Borrower No | Co-Borrower Yes | Co-Borrower No |
|---|---|---|---|---|
| a. Are there any outstanding judgments against you? | ☐ | ☒ | ☐ | ☐ |
| b. Have you been declared bankrupt within the past 7 years? | ☐ | ☒ | ☐ | ☐ |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☒ | ☐ | ☐ |
| d. Are you a party to a lawsuit? | ☐ | ☒ | ☐ | ☐ |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | ☐ | ☒ | ☐ | ☐ |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond or loan guarantee? If "Yes," give details as described in the preceding question. | ☐ | ☒ | ☐ | ☐ |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☒ | ☐ | ☐ |
| h. Is any part of the down payment borrowed? | ☐ | ☒ | ☐ | ☐ |
| i. Are you a co-maker or endorser on a note? | ☐ | ☒ | ☐ | ☐ |
| j. Are you a U.S. citizen? | ☒ | ☐ | ☐ | ☐ |
| k. Are you a permanent resident alien? | ☐ | ☒ | ☐ | ☐ |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☒ | ☐ | ☐ | ☐ |
| m. Have you had an ownership interest in a property in the last three years? | ☒ | ☐ | ☐ | ☐ |
| (1) What type of property did you own — principal residence (PR), second home (SH), or investment property (IP)? | PR | | | |
| (2) How did you hold title to the home — solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | S | | | |

### IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges, that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement:** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X *Linda Bryant* | 12-22-05 | X | |

### X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

**VERIFIED COMPLAINT**

PROSPECTUS SUPPLEMENT TO PROSPECTUS DATED JANUARY 6, 2006

WAMU MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-AR1

WAMU ASSET ACCEPTANCE CORP.
DEPOSITOR

WASHINGTON MUTUAL BANK
SPONSOR AND SERVICER

$1,474,488,100
(APPROXIMATE)

**Cut-Off Date**
January 1, 2006

**Closing Date**
On or about January 30, 2006

## THE POOLING AND SERVICING AGREEMENT

**General**

Pooling and Servicing Agreement

Events of default under each pooling and servicing agreement will include
each of the following:

> any failure by the servicer to make any required advance of
> delinquent principal and interest that continues unremedied
> at the opening of business on the distribution date in
> respect of which such advance was to have been made;

> any failure by the servicer to remit to the trustee for
> distribution to securityholders any other required payment
> that continues unremedied for a specified number of days
> after the giving of written notice of the failure to the

servicer by the trustee, or to the servicer and the trustee
by the holders of certificates evidencing not less than 25%
of the voting rights;

any failure by the servicer duly to observe or perform in
any material respect any of its other covenants or
obligations under the agreement which continues unremedied
for a specified number of days after the giving of written
notice of the failure to the servicer by the trustee, or to
the servicer and the trustee by the holders of certificates
evidencing not less than 25% of the voting rights; and

events of insolvency, readjustment of debt, marshalling of
assets and liabilities or similar proceedings regarding the
servicer and actions by or on behalf of the servicer
indicating its insolvency or inability to pay its
obligations.

So long as an event of default under a pooling and servicing agreement
remains unremedied, the trustee or the holders of certificates evidencing not
less than 25% of the voting rights may terminate all of the rights and
obligations of the servicer under the pooling and servicing agreement, other
than any retained interest of the servicer and its right to reimbursement for
advances, whereupon the trustee will succeed to all of the responsibilities,
duties and liabilities of the servicer under the agreement and will be entitled
to similar compensation arrangements. If the trustee is prohibited by law from
obligating itself to make advances on delinquent mortgage assets, then the
trustee will not be so obligated.

If the trustee is unwilling to so act, it may, or if the trustee is unable
to so act, it shall, appoint, or petition a court of competent jurisdiction for
the appointment of, a loan servicing institution with a minimum net worth at the
time of the appointment as is set forth in the pooling and servicing agreement,
to act as successor to the servicer under the pooling and servicing agreement.
Pending the appointment of a successor, the trustee is obligated to act in the
capacity of servicer. The trustee and any successor servicer may agree upon the
servicing compensation to be paid, which in no event may be greater than the
compensation payable to the servicer under the related agreement.

If the servicer shall have been terminated following an event of default
described in the first bullet point above, the servicer will have the right, in
limited circumstances described in the pooling and servicing agreement, to
remedy such event of default and thereafter resume its rights and obligations as
servicer.

No securityholder will have the right under any pooling and servicing
agreement to institute any proceeding under the agreement unless:

the securityholder previously has given to the trustee
written notice of default,

the holders of securities evidencing not less than 25% of
the voting rights have made written request upon the trustee
to institute the proceeding in its own name as trustee,

there shall have been offered to the trustee reasonable
indemnity, and

the trustee for a specified number of days after its receipt
of notice has neglected or refused to institute a
proceeding.

The trustee, however, will be under no obligation to exercise any of the trusts
or powers vested in it by any pooling and servicing agreement or to make any
investigation of matters arising under that pooling and servicing agreement or
to institute, conduct or defend any litigation at the request, order or
direction of any of the holders of securities covered by the agreement, unless
the securityholders have offered to the trustee reasonable security or indemnity
against the costs, expenses and liabilities which may be incurred.

## Servicing Agreement

A servicing default under the related servicing agreement will include each
of the following:

any failure by the servicer to make a required deposit to a
specified account which continues unremedied for a specified
number of business days after the giving of written notice
of the failure to the servicer by the trustee or by any
other specified party;

any failure by the servicer duly to observe or perform in
any material respect any other of its covenants or
agreements in the servicing agreement with respect to the
series of notes which continues unremedied for a specified
number of days after the giving of written notice of the
failure to the servicer by the trustee or any other
specified party;

events of insolvency, readjustment of debt, marshalling of
assets and liabilities or similar proceedings regarding the
servicer and actions by the servicer indicating its
insolvency or inability to pay its obligations and

any other servicing default as set forth in the servicing
agreement.

So long as a servicing default remains unremedied, either the depositor or
the trustee may, by written notification to the servicer and to the issuer or
the trustee, as applicable, terminate all of the rights and obligations of the
servicer under the servicing agreement, other than the servicer's right to
reimbursement for advances. Upon termination of the servicer the trustee will
succeed to all responsibilities, duties and liabilities of the servicer under
the servicing agreement, other than any obligation to repurchase mortgage loans,
and will be entitled to similar compensation arrangements. If the trustee is
unwilling to so act, it may appoint, or if it is unable to so act, it shall
appoint, or petition a court of competent jurisdiction for the appointment of,
an approved mortgage servicing institution with a minimum net worth at the time

of the appointment as is set forth in the servicing agreement, to act as successor to the servicer under the servicing agreement. Pending the appointment of a successor, the trustee is obligated to act in the capacity of servicer. The trustee and the successor may agree upon the servicing compensation to be paid, which in no event may be greater than the compensation to the initial servicer under the servicing agreement.

Indenture

An event of default under the indenture will include each of the following:

> a default by the issuer for a specified number of days or more in the payment of any principal of or interest on any note of the series;

> failure by the issuer to perform any other covenant in the indenture which continues for a specified number of days after notice of failure is given in accordance with the procedures described in the related prospectus supplement;

> any representation or warranty made by the issuer in the indenture or in any related certificate or other writing having been incorrect in a material respect as of the time made, and the breach is not cured within a specified number of days after notice of breach is given in accordance with the procedures described in the related prospectus supplement;

> events of bankruptcy, insolvency, receivership or liquidation of the issuer; or

> any other event of default provided with respect to notes of that series.

If an event of default with respect to the notes of any series occurs and is continuing, the trustee or the holders of a majority of the then aggregate outstanding amount of the notes of the series may declare the principal amount, or, if the notes of that series are Accrual Securities, the portion of the principal amount as may be specified in the terms of that series, as provided in the related prospectus supplement, of all the notes of the series to be due and payable immediately. That declaration may, under the circumstances set forth in the indenture, be rescinded and annulled by the holders of a majority in aggregate outstanding amount of the related notes.

If following an event of default with respect to any series of notes, the notes of the series have been declared to be due and payable, the trustee may, in its discretion, notwithstanding the acceleration, elect to maintain possession of the collateral securing the notes of the series and to continue to apply payments on the collateral as if there had been no declaration of acceleration if the collateral continues to provide sufficient funds for the payment of principal of and interest on the notes of the series as they would have become due if there had not been a declaration. In addition, the trustee may not sell or otherwise liquidate the collateral securing the notes of a series following an event of default, unless

> the holders of 100% of the then aggregate outstanding amount

of the notes of the series consent to the sale,

the proceeds of the sale or liquidation are sufficient to pay in full the principal of and accrued interest, due and unpaid, on the outstanding notes of the series at the date of the sale, or

the trustee determines that the collateral would not be sufficient on an ongoing basis to make all payments on the notes as the payments would have become due if the notes had not been declared due and payable, and the trustee obtains the consent of the holders of a majority of the then aggregate outstanding amount of the notes of the series.

If the trustee liquidates the collateral in connection with an event of default, the indenture may provide that the trustee will have a prior lien on the proceeds of any liquidation for unpaid fees and expenses. As a result, upon the occurrence of an event of default, the amount available for payments to the noteholders would be less than would otherwise be the case. However, the trustee may not institute a proceeding for the enforcement of its lien except in connection with a proceeding for the enforcement of the lien of the indenture for the benefit of the noteholders after the occurrence of an event of default.

If the principal of the notes of a series is declared due and payable, the holders of those notes issued at a discount from par may be entitled to receive no more than an amount equal to the unpaid principal amount of the note less the amount of the discount that is unamortized.

No noteholder or holder of an equity certificate generally will have any right under a trust agreement or indenture to institute any proceeding with respect to the agreement unless:

the holder previously has given to the trustee written notice of default and the default is continuing,

the holders of notes or equity certificates of any class evidencing not less than 25% of the aggregate percentage interests constituting the class (1) have made written request upon the trustee to institute a proceeding in its own name as trustee and (2) have offered to the trustee reasonable indemnity,

the trustee has neglected or refused to institute a proceeding for 60 days after receipt of the request and indemnity, and

no direction inconsistent with the written request has been given to the trustee during the 60 day period by the holders of a majority of the note balances of the class. However, the trustee will be under no obligation to exercise any of the trusts or powers vested in it by the applicable agreement or to institute, conduct or defend any litigation at the request, order or direction of any of the holders of notes or equity certificates covered by the agreement, unless the holders have offered to the trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby.

## STATIC POOL INFORMATION

On December 29, 2005, the depositor filed with the Securities and Exchange Commission, as Exhibits 99.7 and 99.8 to a Current Report on Form 8-K, static pool information about prior securitized pools of Option ARM Loans of the sponsor. The static pool information includes (i) information about the original characteristics of each prior securitized pool as of the cut-off date for that pool and (ii) delinquency, loss and prepayment information about each prior securitized pool in quarterly increments from the related cut-off date through September 30, 2005. The static pool information about prior securitized pools of Option ARM Loans of the sponsor that were established before January 1, 2006 is not deemed to be a part of this prospectus supplement, the prospectus or the related registration statement. 'OPTION ARM LOANS' are adjustable rate mortgage loans whose interest rates are tied to either the One-Year MTA index (as described under 'Description of the Mortgage Pool -- The Index' below) or the 11th District COFI index (the monthly weighted average cost of funds for Eleventh District savings institutions as announced by the Federal Home Loan Bank of San Francisco), which have initial fixed-rate periods, and which have a negative amortization feature.

THERE CAN BE NO ASSURANCE THAT THE RATES OF DELINQUENCIES, LOSSES AND PREPAYMENTS EXPERIENCED BY THE PRIOR SECURITIZED POOLS WILL BE COMPARABLE TO DELINQUENCIES, LOSSES AND PREPAYMENTS EXPECTED TO BE EXPERIENCED BY THE MORTGAGE LOANS OWNED BY THE TRUST.

### UNDERWRITING OF THE MORTGAGE LOANS

GENERAL

All of the mortgage loans owned by the Trust have been originated in accordance with the underwriting guidelines of the sponsor as described in this section. Mortgage loans may have been underwritten directly by the sponsor or by correspondent lenders with delegated underwriting approval.

The sponsor's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some mortgage loans are manually underwritten, in which case an underwriter reviews a loan application and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms stated in the loan application. Some mortgage loans are underwritten through the sponsor's automated underwriting system, described below.

Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding such factors as their assets, liabilities and related monthly payments, income, employment history and credit history. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history. In the case of some mortgage loans originated under the sponsor's streamline documentation programs (described below), the prospective borrower is not required to provide certain financial information, including information about income and assets.

EVALUATION OF THE BORROWER'S CREDIT STANDING

   To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting companies, usually in the form of a merged credit report. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases the credit report provides a credit score for the borrower, which represents a numerical weighing of the borrower's credit characteristics. Credit scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit scores do not necessarily correspond to the probability of default over the life of a mortgage loan because they reflect past credit history, rather than an assessment of future payment performance. In addition, credit scores only indicate general creditworthiness, and credit scores are not intended to specifically apply to mortgage debt. Credit scores range from approximately 250 to approximately 900, with higher scores indicating more favorable credit history. If the loan underwriter obtains credit scores from three credit reporting companies, the middle score generally is used, and if two credit scores are obtained, the lowest score generally is used. In the case of co-borrowers, the credit score for the borrower with the lowest credit score generally is used (determined for each borrower as described in the immediately preceding sentence). Minimum credit scores are required for some loan products and loan programs. Credit scores may not be available for some borrowers.

EVALUATION OF THE BORROWER'S REPAYMENT ABILITY

   In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the 'housing-to-income ratio' or 'front end ratio'), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the 'debt-to-income ratio' or 'back end ratio'). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

   For purposes of calculating the 'front end' and 'back end' ratios for an Option ARM Loan, the borrower's monthly mortgage debt is determined based on a minimum mortgage loan interest rate, which rate may be greater than the rate in effect for the mortgage loan during the initial fixed-rate period. This minimum rate is set by the sponsor's credit department from time to time, and varies according to occupancy status and other factors. In addition, for purposes of calculating these ratios for an Option ARM Loan with a 40-year term, the borrower's monthly mortgage debt is determined based on 30-year term.

EVALUATION OF THE ADEQUACY OF THE COLLATERAL

   The adequacy of the mortgaged property as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or

Freddie Mac. Appraisers may be staff appraisers employed by the sponsor or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of mortgage loans underwritten through the sponsor's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. For mortgage loans underwritten under the sponsor's streamline documentation programs, the appraisal guidelines in some cases permit the appraisal obtained for an existing mortgage loan to be used. Title insurance is required for all mortgage loans, except that for mortgage loans secured by shares of cooperative apartments, title insurance is not required for the cooperative apartment building (but a lien search is provided by the title company). Specific additional title insurance coverage is required for some types of mortgage loans.

DOCUMENTATION PROGRAMS

Each mortgage loan has been underwritten under one of three documentation guidelines for verification of the borrower's stated income and assets. Under the sponsor's full/alternative documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form or, in the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required. Under the full/alternative documentation program, the borrower's stated assets are verified through receipt of the borrower's two most recent bank or brokerage statements. In addition, the borrower's employment is verified with the employer by telephone.

The sponsor's low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. It is available to borrowers with certain loan-to-value ratios, loan amounts and credit scores. Under this program, the income as stated in the borrower's loan application is not verified, although the borrower's employment may be verified by telephone. The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion). Assets are required to be verified when used as a compensating factor to support the borrower's claimed income or when specific loan-to-value ratio or loan amount maximums are exceeded.

The sponsor has several 'streamline' documentation programs under which the prospective borrower's income and assets either are not required to be obtained or are obtained but not verified. Eligibility criteria vary but may include minimum credit scores, maximum loan amounts, maximum debt-to-income ratios and specified payment histories on an existing mortgage loan (generally, a history of timely mortgage payments for the past twelve months, or for the duration of the mortgage loan if less than twelve months old) or on other debt. Purchase loans as well as refinance loans may be eligible under the streamline documentation programs. For some mortgage loans that qualify under these

programs, the borrower's income and assets are not required to be obtained. For some other mortgage loans that qualify under these programs, the borrower's income and assets are obtained but not verified, the borrower's employment is verified with the employer by telephone, and the borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion).

A credit report for the borrower generally is required for all mortgage loans underwritten under the sponsor's full/alternative and low documentation programs, and for all but a small percentage of mortgage loans underwritten under the sponsor's streamline documentation program.

EXCEPTIONS TO PROGRAM PARAMETERS

Exceptions to the sponsor's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

AUTOMATED UNDERWRITING SYSTEM

Some mortgage loans originated through the sponsor's retail and wholesale lending divisions have been underwritten in whole or in part through the sponsor's proprietary automated underwriting system, known as Enterprise Decision Engine or 'EDE'. Based on the borrower's credit report and the information in the borrower's loan application, the system either (a) approves the loan subject to the satisfaction of specified conditions, which may include the receipt of additional documentation, or (b) refers the loan application to an underwriter for manual underwriting. In making the underwriting decision, EDE distinguishes between ten different levels of credit standing, based on both the credit score and other items in the borrower's credit report. The sponsor has developed these ten levels of credit standing based on a statistical analysis of the past performance of approximately 193,000 mortgage loans originated by the sponsor for its own portfolio between 1998 and 2001. The sponsor has been using EDE for underwriting of mortgage loans since January 2005. The sponsor has also used in the past, and currently uses, other automated underwriting systems. All or some of the mortgage loans owned by the Trust may have been underwritten through EDE or other automated underwriting systems.

QUALITY CONTROL REVIEW

The sponsor's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated mortgage loans on a regular basis.

THE DEPOSITOR

WaMu Asset Acceptance Corp., the depositor, is a Delaware corporation and a wholly owned subsidiary of the sponsor. The depositor engages in no activities other than securitizing assets. It will have no material continuing obligations with respect to the mortgage loans or the certificates following the issuance of the certificates, other than the obligations (i) to file financing statements perfecting the Trust's interest in the mortgage loans, (ii) to repurchase or

substitute for affected mortgage loans in the event of a material breach of a representation and warranty made by the depositor in the pooling agreement that has not been remedied and (iii) to indemnify the underwriter against some civil liabilities, including liabilities under the Securities Act of 1933.

## ASSIGNMENT OF THE MORTGAGE LOANS AND OTHER ASSETS TO THE TRUST

A pool of mortgage loans, as described in this prospectus supplement, will be sold to the Trust on January 30, 2006 (the 'CLOSING DATE'). The Trust will own the right to receive all payments of principal and interest on the mortgage loans due after January 1, 2006 (the 'CUT-OFF DATE'). A schedule to the pooling agreement will include information about each mortgage loan, including:

> the applicable loan group;

> the outstanding principal balance as of the close of business on the Cut-Off Date;

> the term of the mortgage loan; and

> the mortgage interest rate as of the close of business on the Cut-Off Date and information about how that mortgage interest rate adjusts.

The mortgage notes will not be endorsed to the Trust and no assignment of the mortgages to the Trust will be prepared. Washington Mutual Bank fsb, a wholly-owned subsidiary of the servicer, will have possession of and will review the mortgage notes and mortgages as custodian for the Trust and financing statements will be filed evidencing the Trust's interest in the mortgage loans.

The mortgage pool will be the primary asset of the Trust. The Trust will also contain other assets, including:

> insurance policies related to individual mortgage loans, if applicable;

> any property that secured a mortgage loan that the Trust acquires after the Cut-Off Date by foreclosure or deed in lieu of foreclosure; and

> amounts held in the certificate account.

In exchange for the mortgage loans and the other assets described above, the trustee will authenticate and deliver the certificates pursuant to the order of the depositor.

It is the intent of the parties to the pooling agreement that the conveyance of the mortgage loans and the related assets to the Trust constitute an absolute sale of those assets. However, in the event that the pooling agreement for any reason is held or deemed to create a security interest in those assets, then the pooling agreement will constitute a security agreement and the depositor grants to the Trust a security interest in those assets. The depositor will file

financing statements perfecting such security interest.

RESTRICTIONS ON ACTIVITIES OF THE TRUST

Pursuant to the pooling agreement, the Trust will have the power and authority (i) to acquire, hold, lease, manage, administer, control, invest, reinvest, operate and transfer assets of the Trust, (ii) to issue and make distributions on the certificates and (iii) to engage in such other activities as are described in the pooling agreement. The Trust will be required to act in accordance with requirements specified in the pooling agreement that are designed to maintain the Trust's existence as a legal entity separate and distinct from any other entity. The Trust will not be permitted to do any of the following:

to engage in any business or activity other than those described in the pooling agreement;

to incur or assume any indebtedness other than indebtedness incurred under the pooling agreement or any related agreement;

to guarantee or otherwise assume liability for the debts of any other entity;

to confess a judgment against the Trust;

to possess or assign the assets of the Trust for other than a Trust purpose;

to lend any funds to any entity, except as contemplated by the pooling agreement; or

to do other actions prohibited by the pooling agreement.

The permissible activities of the Trust may not be modified except by an amendment to the pooling agreement. See 'Description of the Certificates -- Amendment of the Pooling Agreement' in this prospectus supplement.

DISCRETIONARY ACTIVITIES WITH RESPECT TO THE TRUST

The following is a description of material discretionary activities that may be taken with regard to the administration of the mortgage loans or the certificates:

The servicer will be authorized to exercise discretion with regard to its servicing of the mortgage loans in accordance with the servicing standard specified in the pooling agreement. See 'Servicing of the Mortgage Loans -- The Servicer -- Servicing Procedures' in this prospectus supplement.

Each of the sponsor and the depositor will have discretion to determine whether to repurchase a mortgage loan or to substitute for a mortgage loan, if required under the pooling agreement to repurchase or substitute for a

defective mortgage loan. See 'Description of the Mortgage
Pool -- Representations and Warranties Regarding the
Mortgage Loans' in this prospectus supplement.

On any Distribution Date after the Clean-Up Call Option
Date, the servicer will be permitted to purchase all of the
mortgage loans owned by the Trust. See 'Description of the
Certificates -- Optional Termination of the Trust' in this
prospectus supplement.

In the event of certain transfers of the Class R
Certificates to a person who is not a permitted transferee
under the pooling agreement, the depositor will have the
right to sell the Class R Certificates to a purchaser
selected by the depositor.

In the event of a default by the servicer under the pooling
agreement that has not been remedied, either the trustee or
holders of certificates evidencing at least 25% of the
voting rights will have the right to terminate the servicer.
If the servicer is terminated or resigns the trustee will
become the successor servicer; however, the trustee will
have the right to appoint, or to petition a court to
appoint, a successor servicer. See 'The Trustees -- The
Trustee -- Events of Default Under the Pooling Agreement' in
this prospectus supplement.

Holders of certificates evidencing more than 50% of the
voting rights will have the right at any time to remove the
trustee or the Delaware trustee and to appoint an eligible
successor trustee.


**424B5:**

http://www.sec.gov/Archives/edgar/data/1317069/000095011706000299/a41207.txt

# SUMMARY INFORMATION

**THE FOLLOWING SUMMARY HIGHLIGHTS SELECTED INFORMATION FROM THIS PROSPECTUS
SUPPLEMENT. IT DOES NOT CONTAIN ALL OF THE INFORMATION THAT YOU NEED TO CONSIDER
IN MAKING YOUR INVESTMENT DECISION. TO UNDERSTAND THE TERMS OF THE OFFERED
CERTIFICATES, READ CAREFULLY THIS ENTIRE PROSPECTUS SUPPLEMENT AND THE
ACCOMPANYING PROSPECTUS.**

**THIS SUMMARY PROVIDES AN OVERVIEW OF CERTAIN CALCULATIONS, CASH FLOWS AND OTHER
INFORMATION TO AID YOUR UNDERSTANDING. THIS SUMMARY IS QUALIFIED BY THE FULL
DESCRIPTION OF THESE CALCULATIONS, CASH FLOWS AND OTHER INFORMATION IN THIS
PROSPECTUS SUPPLEMENT AND THE ACCOMPANYING PROSPECTUS.**

## TRANSACTION PARTICIPANTS

On January 30, 2006, which is the closing date, the mortgage loans that support the certificates will be sold by Washington Mutual Bank, the sponsor of the securitization transaction, to WaMu Asset Acceptance Corp., the depositor. On the closing date, the depositor will sell the mortgage loans and related assets to the WaMu Mortgage Pass-Through Certificates Series 2006-AR1 Trust. In exchange for the mortgage loans and related assets, the Trust will issue the certificates pursuant to the order of the depositor.

The mortgage loans will be serviced by Washington Mutual Bank, as servicer. Some servicing functions will be performed by Washington Mutual Mortgage Securities Corp., as administrative agent of the servicer. Some servicing functions will be outsourced to third party vendors.

The trustee of the Trust will be Deutsche Bank National Trust Company, and the Delaware trustee will be Deutsche Bank Trust Company Delaware. Washington Mutual Bank fsb will have possession of and will review the mortgage notes, mortgages and other legal documents related to the mortgage loans as custodian for the Trust.

TA:
http://www.sec.gov/Archives/edgar/data/1317069/000095011706000299/a41207.txt

*(This area was intentionally left blank)*

# NEW YORK STATE TRUST LAW STATUTES STATES:

**NY Estates, Powers and Trust Law § 7-1.18 Trust Asset**
Unless an asset is transferred into a lifetime trust, the asset does not become trust property.

**NY Estates, Powers and Trust Law § 7-2.4. Trustees Duties**
A trustee's act that is contrary to the trust agreement is void.

**NY Estates, Powers and Trust Law § 5-1401. Choice of law.**
1. The parties to any contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate not less than two hundred fifty thousand dollars, including a transaction otherwise covered by subsection one of section 1-105 of the uniform commercial code, may agree that the law of this state shall govern their rights and duties in whole or in part, whether or not such contract, agreement or undertaking bears a reasonable relation to this state. This section shall not apply to any contract, agreement or undertaking (a) for labor or personal services, (b) relating to any transaction for personal, family or household services, or (c) to the extent provided to the contrary in subsection two of section 1-105 of the uniform commercial code.

2. Nothing contained in this section shall be construed to limit or deny the enforcement of any provision respecting choice of law in any other contract, agreement or undertaking.

**NY Estates, Powers and Trust Law § 5-1402. Choice of forum.**
1. Notwithstanding any act which limits or affects the right of a person to maintain an action or proceeding, including, but not limited to, paragraph (b) of section thirteen hundred fourteen of the business corporation law and subdivision two of section two hundred-b of the banking law, any person may maintain an action or proceeding against a foreign corporation, non-resident, or foreign state where the action or proceeding arises out of or relates to any contract, agreement or undertaking for which a choice of New York law has been made in whole or in part pursuant to section 5-1401 and which (a) is a contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state.

2. Nothing contained in this section shall be construed to affect the enforcement of any provision respecting choice of forum in any other contract, agreement or undertaking

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 3

**VERIFIED COMPLAINT**

Branch :S06,User :4000          Comment:                          Station Id :RXDA



L E A D   S H E E T

02-0591282

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA

MAR    12  2002   AT 8 A.M.

SPACE ABOVE THIS LINE FOR RECORDERS USE



**TITLE(S)**

_DEED_

FEE

| FEE $10 | MM |
|---------|----|
|         | 2  |

CODE
20

CODE
19

CODE
9

D.T.T.
$280.50
$1147.50



Assessor's Identification Number (AIN)
To Be Completed By Examiner OR Title Company In Black Ink

5 0 7 4 - 0 0 3 - 0 0 4

Number of Parcels Shown

0.01



**THIS FORM IS NOT TO BE DUPLICATED**

LOS ANGELES,CA
Document: D 2002.591282

Page 1 of 3

Printed on 7/23/2012 4:59:14 PM

Branch :S06,User :4000                    Comment:                    Station Id :RXDA

# CHICAGO TITLE

RECORDING REQUESTED BY:
Chicago Title Company

Escrow No. 7384-WWP
Title Order No. 16076086-A43

When Recorded Mail Document
and Tax Statement To:
Linda Bryant
C/O  Gateway Realty
1445 Huntington Drive # 200
South Pasadena, CA 91030

02  0591282

2

APN: 5074-003-004

16076282-A43

GRANT DEED

SPACE ABOVE THIS LINE FOR RECORDER'S USE

The undersigned grantor(s) declare(s)
Documentary transfer tax is $ 280.50 City tax $ 1,147.50
[ X ]  computed on full value of property conveyed, or
[   ]  computed on full value less value of liens or encumbrances remaining at time of sale,
[   ]  Unincorporated Area    City of Los Angeles

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged.
Amalia Jones,  a widow

hereby GRANT(S) to   Linda Bryant, an Unmarried Woman

the following described real property in the City of Los Angeles
County of Los Angeles,  State of California:
SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Property Address:  1411 So. Oxford Avenue, Los Angeles, CA  90006

DATED:  December 10, 2001

STATE OF CALIFORNIA
COUNTY OF  _Los Angeles_
ON _January 2, 2002_____ before me,
_Clarence Ellington II_ personally appeared
_Amalia C. Jones_

personally known to me (or proved to me on the basis
of satisfactory evidence) to be the person(s) whose
name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the
same in his/her/their authorized capacity(ies), and that
by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

Witness my hand and official seal.

Signature

_Amalia Jones_
Amalia
C.

CLARENCE ELLINGTON II
Commission # 1306085
Notary Public - California
Los Angeles County
My Comm. Expires May 27, 2005

MAIL TAX STATEMENTS AS DIRECTED ABOVE

FD-213 (Rev 9/94)                    GRANT DEED

LOS ANGELES,CA
Document: D 2002.591282

Page 2 of 3

Printed on 7/23/2012 4:59:20 PM

Escrow No. 7384-WWP
Title Order No. 15076086-A43

## EXHIBIT "A"

The Southerly 7 feet of Lot 2 and the Northerly 41 feet of Lot 3 in Block F of the Washington Street and Pico Street Heights Tract in the City of Los Angeles, County of Los Angeles State of California, as shown on map filed in Book 25, Page 36 of Maps in the office of the County Recorder of said County.

02 0591282

# EXHIBIT 4

**VERIFIED COMPLAINT**



PNOTE

# ADJUSTABLE RATE NOTE
## (12-MTA Index - Payment and Rate Caps)

03-2307-070477473-6

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __550,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| __December 20, 2005__ | __TEMPLE CITY__ | __California__ |
|---|---|---|
| | (City) | (State) |

__1411 S. OXFORD AVENUE, LOS ANGELES, CA 90006__
(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ ___440,000.00___ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is ___Washington Mutual Bank, FA___ . I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __5.500__ %. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __5.500__ %. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1st__ day of each month beginning on ___February, 2006___ , I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on ___January 1, 2046___ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at ___9451 CORBIN AVE, NORTHRIDGE, CA 91324___ _____, or at a different place if required by the Note Holder.

### (B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $__2,269.39__ , unless adjusted at an earlier time under Section 4(H) of this Note.

32859 (11-01)          Page 1 of 6

Certified to be a true and
exact copy of the original

Jade Escrow, Inc.

03-2307-070477473-6

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may further change on the ___1st___ day of ___January, 2011___, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Two & Eighty-Five-Hundredths___ percentage points ___2.850___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___Twelve & Two-Tenths___ percentage points ___12.200___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___February 1, 2011___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

32859 (11-01)                              Page 2 of 6

Certified to be a true and exact copy of the original

Jade Escrow, Inc.

03-2307-070477473-6

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on   the maturity date in substantially equal payments.  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate.  For each month that the  monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to   __125%__  of the principal amount original borrowed.  In the event my unpaid Principal would otherwise exceed that  __125%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I)  Required Full Monthly Payment**

On the  __TENTH__  anniversary of the due date of the first monthly payment, and on that same day every  __FIFTH__  year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K)  Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note.  If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.  LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then;  (a) any such loan charge shall be reduced by the amount

Certified to be a true and
exact copy of the original

Jade Escrow, Inc.

03-2307-070477473-6

necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ 15.00 . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

7. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once of each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

Certified to be a true and exact copy of the original

Jade Escrow, Inc.

03-2307-070477473-6

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the  Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver

Certified to be a true and exact copy of the original

Jade Escrow, Inc.

03-2307-070477473-6

to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

LINDA BRYANT

Certified to be a true and exact copy of the original

Jade Escrow, Inc.